# United States District Court
# Northern District of Alabama
# Western Division

FILED

02 OCT -7 PH 3: 10

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| Deborah K. Cornwell, | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV-01-N-0331-W |
| | ] | |
| Delphi Automotive Systems L.L.C., | ] | |
| and Jimmy Williams, | ] | |
| | ] | |
| Defendant(s). | ] | |

ENTERED

OCT 0 7 2002

## Memorandum of Opinion

## I.   Introduction

The court has for consideration the motion for summary judgment filed by defendant Delphi Automotive Systems L.L.C., (hereinafter "Delphi"), on March 19, 2002 (Doc. #73) and defendant Jimmy Williams (hereinafter "Williams"), on March 15, 2002 (Doc. # 70). Plaintiff Deborah K. Cornwell (hereinafter "Cornwell"), alleges that she suffered hostile environment sexual discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981, while an employee with Delphi.[1] Plaintiff also asserts state law claims for invasion of privacy against both Delphi and Williams, and negligent supervision and hiring against Delphi. (Doc. #1). Delphi Automotive contends that judgment is due in its favor because the plaintiff cannot establish a prima facie case of sex discrimination and cannot meet the Alabama requirements for invasion of privacy. Moreover, it contends that

---

[1] The United States Supreme Court has recently abandoned as determinative the distinction between so-called *quid pro quo* sexual harassment and hostile environment sexual harassment. *See Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998). The nomenclature remains useful in distinguishing between that type of sexual harassment which results in a tangible employment action (formerly *quid pro quo* sexual harassment) and that which does not (formerly hostile environment harassment).



Alabama law does not allow a state law claim for negligent supervision in cases of sexual harassment. (Doc. #74). Williams contends that Cornwell cannot meet the Alabama requirements to establish an invasion of privacy claim. (Doc. #71). The issues have been fully briefed by the parties and were argued at the court's regularly scheduled motion docket on Tuesday, October 2, 2002. They are now ripe for decision. Upon due consideration, the motions for summary judgment will be **GRANTED** in all respects.

## II.   Statement of Facts[2]

Viewed in the light most favorable to the plaintiff, the evidence of record suggests the following facts: Deborah Cornwell, began working for Delphi at its Tuscaloosa, Alabama, facility in May 1979, as an hourly production employee. She was a member of the United Auto Workers ("the union"). Cornwell claims that her co-worker and fellow union member, Jimmy Williams, sexually harassed her. Williams also began working for Delphi in 1979 but in the skilled trades area.

Initially, the relationship between Cornwell and Williams could be described as friendly. Cornwell claims that Williams began to make remarks of a sexual nature in approximately 1983 or 1984. Cornwell claims over the course of a fifteen-year period, he made a variety of offensive comments. She claims that Williams would frequently read the wording on her t-shirts aloud, stretching out the words so as to allude to the fact that she had large breasts. She further alleges that Williams told her a joke comparing women's

---

[2] In developing the statement of facts in this opinion, the court considered those facts claimed to be undisputed by the parties, the parties' respective responses to those claims, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund,* 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. Denied, USX Corp., v. Cox,* 114 S. Ct. 900 (1995).

breasts to puppy dogs with brown noses and then, over the course of fifteen years, asked her whether he could have one of her puppy dogs and told her "he bet when [she] was in the shower all wet, that [she] looked like [she] had two little wet puppy dogs with little brown noses."[3] On occasion, Williams allegedly said to Cornwell that "he wished he could put his head under [Cornwell's] t-shirt and read what it said from the inside out."

Cornwell also testified that Williams frequently made lewd and juvenile comments. For example, when she would walk past Williams he would say, among other things, "baby's got her blue jeans on." Other times, Cornwell claims Williams told her that "he bet it was hard for [her] husband to get up and leave [her] bed in the morning." In addition, on at least one occasion Williams "fake[d] a Fred Sanford heart attack" and said "this woman just drives me crazy."

During 1998 or 1999 Cornwell had breast reduction surgery. Following the surgery she alleges that Williams would wave to her when he would come to work in her department and on one occasion, Williams said, "I think they're growing back," and on another occasion said he "wished he had what was left over so he could put it in his pocket to play with it."[4]

Delphi, had then and has now, a sexual harassment policy, which it posts on bulletin boards and in collective bargaining agreements between Delphi and the Union. In addition Delphi also publishes a pamphlet entitled "Faces of Cooperation" which encourages

---

[3] All parties agree this comment was made. There is dispute among the parties as to whether Williams told the joke in relation to Cornwell and how many times Williams told Cornwell the joke.

[4] Williams admits to faking a "Fred Sanford" heart attack and commenting on the plaintiff's breasts after the surgery. He disputes the frequency of the comments and disputes the last comment entirely.

3

employees to make use of a local grievance procedure. (Doc. # 81, Pl. Ex. #9). Finally, Delphi publishes an additional volume "Sexual Harassment/Working Relationships: What Every General Motors Employee Should Know" which outlines the company's policy prohibiting sexual harassment.  Cornwell was aware of the Delphi policy and that it was posted throughout the facility but testified that she did not complain earlier of Williams's conduct because he was a fellow union member and because Delphi had been unresponsive when she complained in 1994 about an inappropriate comment by another co-worker.

On March 31, 2000, Cornwell became particularly upset when Williams faked another "Fred Sanford heart attack." Williams's co-worker Debbie Dolan noticed that Cornwell was upset and later witnessed Williams's attempts to apologize to her.  Dolan encouraged Cornwell to file a complaint. Later that day both Dolan and Cornwell reported Williams's harassment to Gary Gilliam, Delphi's Supervisor of Labor Relations. Dolan told Gilliam what she had witnessed, and Cornwell detailed the history of harassment from Williams. Gilliam told Cornwell that he would investigate the matter.

Pursuant to the terms of the collective bargaining agreement, Gilliam put Williams on notice that he might be subject to disciplinary action. Williams requested that the union represent him in the matter. Later Gilliam met with Williams and UAW shop committeeman Troy Stamper. Gilliam told Williams of Cornwell's allegations and Stamper requested that local union chairman Guy Mullinax participate in the proceedings. A second meeting was held later that day. Gilliam decided to terminate Williams's employment with Delphi on

March 31, 2000, for violation of Delphi's sexual harassment policy, and Cornwell was informed of the termination.

Prior to leaving the plant, Williams filed a grievance charging management with "an unjust discharge." The union appealed the denial of Williams's grievance and Gilliam and the union negotiated a settlement of Williams's grievance on April 13, 2000. Under the terms of the agreement, Williams would be returned to work on "an absolutely one last chance" basis on April 17, 2000, after a two-week suspension with no pay or benefits. Upon hearing of Williams' return to work following his suspension, Cornwell went to Delphi on April 18, 2000, to talk to Gary Gilliam, but has refused to work there since Williams' return. There have been no complaints of sexual harassment with respect to Williams since Cornwell's March 31, 2000, complaint and his subsequent discipline.

Cornwell also alleges that the work environment at Delphi was charged with sexually offensive conduct. Her supporting evidence contains depositions from co-workers which describe a variety of incidents (all of which are disputed by Delphi) that workers of both sexes engaged in inappropriate behavior. For example, female workers were known to grab the genitals of some men, make comments to men about not having enough "ass to fill pants," and to pin mistletoe to their crotches and have men kiss them "beneath the mistletoe." Male workers also were said to masturbate, sell pornographic videos, post a nude photo on the forklift and to touch workers inappropriately. Cornwell never participated in any of these activities and, aside from her complaints about Williams, has not claimed that any of this conduct was directed toward her.

Cornwell began seeing a psychologist, Dr. Ruth Lyman, on April 20, 2000, and on Dr. Lyman's recommendation sees Dr. Lawrence DePalma, a psychiatrist. Dr. Lyman has determined that she is emotionally and psychologically unable to work at Delphi. On earlier occasions, Cornwell had sought psychological treatment for issues related to abuse by her former husband and family. Allegedly, this was during the period when Williams engaged in his offensive conduct. She, however, never discussed Williams's conduct harassment with her therapist.

## III.   Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotations omitted); *see also Crawford-El v. Britton*, 523 U.S. 574, 600 n.22 (1998). The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Once the moving party has met this burden, "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the

'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts

showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must grant a motion for summary judgment if there is no genuine issue of

material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56(c). The substantive law will identify which facts are material and which are irrelevant.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249; *see also*

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted. *Id.*

at 249 (citations omitted); *accord Dzikowski v. NASD Regulation, Inc. (In re Scanlon)*, 239

F.3d 1195, 1198 (11th Cir. 2001); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282

(11th Cir. 1999). In rendering its decision, "[a] court 'must draw all reasonable inferences

in favor of the nonmoving party, and it may not make credibility determinations or weigh the

evidence.'" *Hinson v. Clinch County Bd. of Educ.*, 231 F.3d 821, 826-27 (11th Cir. 2000)

(quoting *Reeves*, 530 U.S. at 150).

## IV.   Discussion

### A. Evidence Considered by the Court

Delphi argues that much of the behavior that Cornwell complains of in her lawsuit,

is time-barred for failure to file a timely claim with the EEOC. Under Title VII, a plaintiff must

file a charge of discrimination within 180 days of the actions alleged to be discriminatory,

or she is barred from bringing a lawsuit based on those actions. 42 U.S.C. § 2000e-5(e); *Thomas v. Kroger Co.*, 24 F.3d 147, 150 (11th Cir. 1994); *Malone v. K-Mart Corp.*, 51 F. Supp. 2d 1287, 1300-01 (M.D. Ala. 1999). The purpose of the requirement is (1) to give the employer prompt notice of the complaint against it, and (2) to give the EEOC sufficient time to attempt the conciliation process before a civil action is filed. *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1103 (11th Cir. 1996); *Hipp v. Liberty National Life Ins.*, 252 F.3d 1208, 1220 (11th Cir. 2001) (restating the *Grayson* standard). Cornwell filed a charge of discrimination on May 24, 2000. Accordingly, any cause of action based upon actions alleged to be discriminatory that occurred before November 26, 1999, is barred as untimely.[5] Therefore, the only conduct falling within the statutory period is that occurring between November 26, 1999, and March 31, 2000, a period of approximately four months.[6]

### B. Ms. Cornwell's Claims of Discrimination

Ms. Cornwell's claims that the atmosphere at Delphi in conjunction with Williams's harassment created a hostile work environment. A hostile work environment challenges workplace practices rather than tangible job benefits. To establish a hostile environment claim, an employee must prove: (1) she belongs to a protected class–in the instant case, the employee must be a female; (2) the sexual harassment was unwelcome; (3) the harassment was based on gender; and (4) the harassment affected a term, condition, or

---

[5] The court notes that Ms. Cornwell does not argue that Williams's conduct constituted a continuing violation, perhaps for the reason that such an argument would most likely be unavailing.

[6] Cornwell can pinpoint three instances of (nondisputed) conduct which occurred in the four-month time-period: (1) the "I think they are growing back" comment; (2) the faked "Fred Sanford" heart attack; and (3) the inquiries about her marital relations.

privilege of employment. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (*en banc*), *cert. denied*, 529 U.S. 1068 (2000); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1981). In addition, where a plaintiff seeks to hold her employer liable for the harassment, she must also prove that the employer knew or should have known of the harassment and that it failed to take prompt remedial action. *Breda v. Wolf Camera & Video*, 222 F.3d 886 (11th Cir. 2000), quoting *Henson*, 682 F.2d at 905; *Duhram v. Philippou*, 968 F. Supp. 648, 656 (M.D. Ala. 1997).[7]

### 1. The Environment at Delphi

Cornwell alleges that several women at Delphi have complained of sexual harassment, but her briefs address conduct by both men and women which contributed to a hostile environment.[8] Title VII does not prohibit all verbal or physical harassment in the workplace. Instead it is directed only at "discriminat[ion] . . . because of . . . sex." *Oncale v. Sundowner Services, Inc.*, 523 U.S. 75, 81 (1998). The critical issue is not whether the behavior is offensive but "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id; see also Harris v. Forklift Sys.*, 510 U.S. 17, 21 (noting the test is "but for her sex she would not have been the object of harassment); *Smith v. First Union Nat'l Bank*, 202 F.3d

---

[7] To find a hostile work environment technically, the plaintiff may present a theory of direct or indirect liability. For a theory of direct liability, she must establish that the harasser is the employer or one of its agents; and, for indirect liability, she must show that the employer knew or should have known of the harassment caused by co-workers, but failed to take corrective action. *Duhram v. Philippou*, 968 F. Supp. 648, 656 (M.D. Ala. 1997). This case does not deal with issues of direct liability as it was not the employer who was causing the harassment.

[8] Specifically, Cornwell's reply to Delphi's initial brief titled one section "co-worker affidavits indicate an environment of both men harassing women and women harassing men." (Doc. #80, p.30). Subtitles in this section include statements about "old-fashioned males harassing females" and "new-fashioned women harassing men." (*Id.*)

234, 242 (sex discrimination established if acts would not have occurred but for sex of recipient);) *Mendoza*, 195 F.3d 1238 (11th Cir. 1999) (same); *Henson*, 682 F.2d at 904, 905 n.11 (11th Cir. 1982) ("There may be cases in which a supervisor makes sexual overtures to workers of both sexes or where the conduct complained of is equally offensive to male and female workers. In such cases, sexual harassment would not be based on sex because men and women are accorded like treatment").

Prior to the Supreme Court's Decision in *Oncale*, the Seventh Circuit held that in a case involving a supervisor's harassment of both men and women, the sexual nature of the harassment itself met the "because of sex" requirement. *Doe v. City of Bellesville*, 119 F.3d 563, 577 (7th Cir. 1997); *see also Holman v. Indiana*, 24 F. Supp. 909, 913 (N.D. Ind. 1998) (noting a series of cases and questioning their validity post-*Oncale*). After the *Oncale* decision, however, the Supreme Court has made it fairly clear that sexual content is not the Title VII talisman. As *Oncale* clearly indicates:

> We have never held that workplace harassment even harassment between men and women is automatically discrimination because of sex merely because the words used have sexual content or connotations.

*Id.* For Title VII purposes, it is not enough to establish the conduct was offensive, rather it must be offensive because of sex. *See also Butler v. Yslenta Independent School District,* 161 F.3d 263, 270 (5th Cir. 1998) (discussing Title VII post-*Oncale* and noting that "sending offensive materials to both men and women is evidence that the workplace itself, while perhaps more sexually charged than necessary, was not sexually charged in a way that made it a hostile environment for *either* men *or* women.") (emphasis added); *Raum v. LaidLaw, Ltd.*, 1998 WL 357325 (N.D.N.Y. July 1, 1998) (dismissing Title VII same-sex hostile

work environment sexual harassment claims where plaintiff failed to allege "discrimination ... because of sex" and alleged people "engaged in conduct that some people of either gender may consider to be rude or vulgar behavior.").

As recited in the facts, Cornwell alleges that Delphi's plant was replete with behavior of men harassing women and women harassing men. Although her initial complaint (Doc. #85, Def. Exh. #6 (Cornwell's EEOC Complaint) alleged that the environment was hostile to women, her supporting briefs describe an environment where both men and women engaged in inappropriate behavior in a sexual context. (Doc. #80, p.30). Her supporting affidavits confirm this account. (Doc. #81, Exh. 5-8).

Another court has recently commented that some workplaces sadly reflect the "Slouch Toward Gomorrah" of modern-day society.[9] *See Breda v. Wolf Camera, Inc.,* 148

---

[9]  **The Second Coming**

Turning and turning in the widening gyre
The falcon cannot hear the falconer;
Things fall apart; the centre cannot hold;
Mere anarchy is loosed upon the world,
The blood-dimmed tide is loosed, and everywhere
The ceremony of innocence is drowned;
The best lack all conviction, while the worst
Are full of passionate intensity.
Surely some revelation is at hand;
Surely the Second Coming is at hand.
The Second Coming! Hardly are those words out
When a vast image out of Spiritus Mundi
Troubles my sight: a waste of desert sand;
A shape with lion body and the head of a man,
A gaze blank and pitiless as the sun,
Is moving its slow thighs, while all about it
Wind shadows of the indignant desert birds.
The darkness drops again but now I know
That twenty centuries of stony sleep
Were vexed to nightmare by a rocking cradle,
And what rough beast, its hour come round at last,
Slouches towards Bethlehem to be born?

F. Supp. 1371, 1381 (S.D. Ga. 2001). Based upon the evidence of record, the court seriously doubts that Ms. Cornwell would be able to establish a sexually charged work environment, were she afforded an opportunity to do so at a trial.

### 2. Williams's Conduct

Delphi contends that Williams's conduct does not satisfy the "severe and pervasive" prong of the prima facie case, and even if it did, that it met its responsibility through a swift remedial action. The court agrees with both arguments. Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale v. Sundowner Services, Inc.,* 523 U.S. 75, 81 (1998). Instead, Title VII prohibits the type of severe or pervasive sexual harassment that "alter[s] the conditions of the victim's employment." *Id.* Accordingly, the plaintiff must prove that the harassment was both subjectively and objectively severe and pervasive. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993). Harassment is subjectively severe and pervasive if the complaining employee perceives it as such. *Id.* at 21-22. Objective severity is evaluated "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Mendoza,* 195 F.3d at 1246 (quoting *Oncale*). Four factors guide the analysis: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.* (citing *Allen v. Tyson Foods,* 121 F.3d 642, 647 (11th Cir. 1997) and *Harris,* 510 U.S. at 23).

---

William Butler Yeats

12

The Eleventh Circuit considers conduct "severe and pervasive" when it amounts to a "continuous barrage of harassment." *See Johnson v. Booker T. Washington*, 234 F.3d 501, 507-509 (11th Cir. 2000); *see also Faragher v. City of Boca Raton, 524 U.S. 775 (1998)* ("conduct must be extreme to amount to a change in their terms and conditions of employment"); *Breda v. Wolf Camera, Inc.,* 148 F. Supp. at 1381 (noting that conduct which "makes the grade" in some jurisdictions may not in the Eleventh Circuit); *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F.  Supp. 2d 1254, 1263 (M.D. Ala. 2001) (denying summary judgment where "Plaintiffs were subjected to a continual sustained barrage of unwelcome comments and touchings, including requests for sex and unwelcome grabbing of their hips, buttocks, breasts, and genitalia."). Although the factors appear mechanical, the test is imprecise and the result is a highly fact-specific body of decisional law. *See, e.g. Breda*, 148 F. Supp. 2d 1371 (noting the long list of cases with seemingly inconsistent decisions and likening the test to "trying to nail a jellyfish to the wall"); *Williams v. Russell Corp.,* 2002 WL 157513, *8 (M.D. Ala. 2002) (citing an equally long list of cases). Essentially the Eleventh Circuit has held that conduct which is akin to "ordinary tribulations of the workplace" is not actionable. The "inquiry is not whether work has been impaired, but whether working conditions have been discriminatorily altered."*Breda*, 148 F. Supp. at 1374 (quoting *E.E.O.C. v. R&R Ventures*, 244 F.3d 334, 341 (4th Cir. 2001)).

The test to establish that sexual harassment is both "severe and pervasive" is a stringent one. In *Mendoza*, the court granted summary judgment despite evidence of: (1) one instance in which the harasser said to Mendoza "I'm getting fired up"; (2) one occasion in which the harasser rubbed his hip against Mendoza's hip while touching her shoulder

13

and smiling; (3) two instances in which the harasser made a sniffing sound while looking at Mendoza's groin and one instance of sniffing without looking at her groin and (4) the harasser's "constant" following and staring at Mendoza in a "very obvious fashion." *Mendoza*, 195 F.3d at 1247.

Considering all of the circumstances, the Mendoza court concluded that the alleged conduct fell "well short of the level of either severe or pervasive conduct sufficient to alter Mendoza's terms or conditions of employment." *Id.* The conduct suffered by Mendoza was not physically threatening, humiliating, or severe, and did not interfere with Mendoza's job performance. The court found that the statement "I'm getting fired up," made in the context in which Mendoza alleged, did not objectively constitute a sexual remark. The touching incident was described as "slight," and the negative effect of the constant staring and following was undermined by the fact that there was no allegation of such conduct outside the workplace, nor was it considered to be comparable to stalking, leering, intimidating or threatening. Lastly, because the conduct at issue occurred over an eleven-month period, the court found it "far too infrequent" to alter the conditions of the workplace. *Id.* at 1249.

Likewise in *Gupta*, the statements and conduct of the plaintiff's supervisor, Rhodd: (1) once commented to Gupta that she was "looking very beautiful; (2) made frequent phone calls to Gupta at her home; (3) was once found by Gupta in his office while wearing only an undershirt above the waist which he promptly tucked into his trousers; (4) Rhodd stared at her, touched her ring and bracelet once, and repeatedly asked her out to lunch; and (5) once placed his hand on her knee, and another once touched the hem of her dress. *Gupta*, 212 F.3d 579-81.

14

The court examined each instance, and upon considering all the behavior and conduct of a sexually or gender related nature collectively, found that for summary judgment purposes, there was no issue of material fact regarding whether the conduct complained of was objectively severe or pervasive. As for the "looking very beautiful" comment, the court dismissed it either as a simple compliment, or merely flirtatious conduct which did not amount to sexual harassment. *Id.* at 585. The court also determined that any claim relating to the incident regarding Rhodd tucking in his shirt was undermined by the finding that he had not made any corresponding gestures or comments. *Gupta,* 212 F.3d at 585. The court further described this event as an "isolated occasion" in which the alleged conduct was not "physically threatening or humiliating." *Id.* Rhodd's staring, touching Gupta's hand and bracelet, and asking her to lunch were also found not to involve severe, threatening or humiliating conduct. *Id.*

The court considered the two most serious incidents to be the phone calls and Rhodd's touching of Gupta's knee and dress. While the court concluded the phone calls to be frequent and annoying, they were not found to constitute severe or pervasive sexual harassment. *Id.* As for the touching incidents, they were deemed improper, but not sufficiently improper to create a question of a fact as to the severity or pervasive nature of Rhodd's conduct. In particular, the court placed considerable emphasis on the fact that there were "only two incidents in a period of six or seven months during which they were interacting (out of an even longer period during which the two worked for the University)." *Id.* Each incident was consequently deemed momentary, and neither was determined to be coupled with any verbal suggestions or advances. *Id.*

15

Where, as here, the conduct complained of does not involve touching, the test for an actionable claim is even more difficult. *See Employment Discrimination Coordinator*, ¶ 36, 406 n. 27 (West 2002) (noting that presence of physical contact lessened the plaintiff's burden of proving that conduct was severe and pervasive).[10] Recently, the Eleventh Circuit detailed what is required to meet the severe and pervasive standard for hostile environment claim when the conduct is purely verbal. *See Miller v. Knoworth Dothan, Inc.*, 277 F.3d 1269, 1276-78 (11th Cir. 2002). In *Miller*, the plaintiff's co-workers subjected him to a daily barrage of racial epithets. The plaintiff established that the conduct was both frequent and pervasive when it "permeated the Dolan facility--he hurled the ethnic slurs at Miller three to four times a day." *Id.* at 1274. In addition, the plaintiff's duties required daily interaction with his harassers. *Id.; R&R Ventures*, 244 F.3d at 339-40 (denying summary judgment where a supervisor verbally harassed a fifteen year employee daily over a two-week period).

Viewed in a light most favorable to Cornwell, Williams's non-time-barred behavior towards her can be categorized as follows: (1) references to the plaintiff's breasts regarding her attire and breast reduction surgery; (2) the "Fred Sanford"-like behavior and (3) the generalized inquiries into her private affairs. Defendants correctly point out that Williams never touched Cornwell nor did he proposition her in any way. Both parties contest the

---

[10] It is for this reason that the court declines to further delve into the numerous cases cited by the plaintiff for "severe and pervasive" harassment. The case with the lowest threshold for actionable harassment, *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000) held that conduct amounted to harassment where the plaintiff's supervisor gave her unwanted massages, stood so close to her that his body parts touched her from behind, and pulled his pants tightly so as to reveal his private parts. Moreover in that case the conduct interfered with the plaintiff's job performance. Accordingly, this court holds that *Johnson* is inapplicable to this case because Williams's conduct was purely verbal.

frequency and the pervasive nature of the conduct. Delphi contends it amounted to lewd and boorish behavior, the kind that summary judgment is designed to "filter out."

Like the behavior in *Mendoza* and *Gupta*, Williams's behavior simply cannot be characterized as a "barrage of harassment" which is sufficiently severe and pervasive to alter the terms and conditions of employment. Considered in totality, the "Fred Sanford" heart attacks and the statements made after the plaintiff's breast-reduction surgery simply do not amount to conditions which a reasonable jury might consider humiliating such that it altered the terms and conditions of her employment. The "Fred Sanford" behavior can easily be compared to *Mendoza's* "fired up" statement– annoying and juvenile, but legally insufficient to constitute an actionable case for sexual harassment. The references to the plaintiff's breasts suffer the same pitfalls. Although Cornwell does not have to reach the same level of behavior alleged in *Miller*, construing the facts most favorably to her, they cannot even begin to meet the required threshold. Here, Cornwell did not work in the same department with Williams and the alleged conduct never approached a daily basis. Moreover, Cornwell had excellent job ratings–clearly Williams's behavior never prevented her from performing her assigned duties.[11]

Even if Cornwell could prove that Williams's harassment was sufficiently severe and pervasive to survive summary judgment, the court would still grant summary judgment in

---

[11]Moreover, numerous district courts have held that behavior such as Williams's did not rise to actionable sexual harassment. *See, e.g. Pospicil v. The Buying Office*, Inc., 71 F. Supp. 2d 1346, 1356-57 (N.D. Ga. 1999) (holding that "dirty jokes" were not actionable sexual harassment and that Title VII does not "protect workers from everyday foul language, off-color humor, and suggestive repartee found in our society. The statute was not designed to improve the manners or transform the social mores of the American worker."); *Snellgrove v. Abbeville*, 117 F. Supp. 2d 1218, 1237-38 (M.D. Ala. 1999) (noting that a worker who "hugged the plaintiff sideways" and talked about a desire to "chain[ ] her to a pole").

17

Delphi's favor due to its prompt remedial action. Where the perpetrator of the harassment is merely a co-employee and not a supervisor, the employer will be held directly liable only if: (1) it knew or should have known of the harassing conduct and (2) failed to take prompt remedial action. *See Miller v. Kenworth Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002); *Henson v. City of Dundee*, 682 F.2d 897. A prompt remedial action is one which is "reasonably calculated to end the harassment." *See Waltman v. International Paper Co.*, 875 F.2d 468, 479 (5th Cir. 1989); *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998) (listing other circuits which have adopted this test in evaluating the preventative action). This court holds that Cornwell has provided enough evidence to establish an issue of material fact as to whether Delphi had notice, therefore it addresses the nature of Delphi's response.[12]

Once the plaintiff has proven that the employer knew or should have known of the harassment, it must also show that the employer took no effective action to stop the harassing conduct. *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311 (11th Cir. 1989). Delphi argues that it took effective remedial action when it disciplined Williams, but

---

[12]Notice to the employer may be actual or constructive. Delphi did not have actual notice until Cornwell complained. Accordingly, the issue is whether Delphi can be deemed to have had constructive notice. *Allen v. Tyson* established a list of factors: (1) the remoteness of the location from management; (2) whether the harassment occurred intermittently over a long period of time; (3) whether the victims were employed on a part-time or full-time basis; and (4) whether there were only a few, discrete instances of harassment. 121 F.3d 642, 647-68 (11th Cir. 1997). The *Allen* court also tacitly endorsed the idea that the aforementioned calculus should include consideration as to whether there was an "atmosphere of inappropriate sexual behavior." *Id.* Viewing the facts in a light most favorable to Cornwell, we hold that she has established sufficient facts to create a material issue of fact as to whether there was an inappropriate atmosphere at Delphi. An effective harassment policy may preclude notice. *Miller*, 277 F.3d at 1279-80. However, this court declines to delve into significant fact issues to analyze both the harassment policy and notice when it finds a prompt, effective remedial action.

Cornwell contends that those steps were effective only because she stopped coming to work. This court agrees with Delphi's analysis.[13]

Summarizing the approach taken by other circuits, the court in *Adler v. Wal-Mart Stores, Inc.* explained, "A stoppage of harassment shows effectiveness, which in turn evidences such reasonable calculation." 144 F.3d at 676. The court further noted that "[b]ecause there is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist." *Id.* Only in cases where effectiveness is not readily evidenced by stoppage, does the court consider "the timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the response was proportional to the seriousness and frequency of the harassment." *Id; see also Spicer v. Virginia Dep't of Corrections,* 66 F.3d 705, 711 (4th Cir. 1995) ("[w]hen presented with the existence of illegal conduct, employers can be required to respond promptly and effectively, but when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well.); *Fleenor,* 81 F.3d at 50) (holding that where company acted promptly it was relieved of all liability for conduct up to the time the employee complained).

Plaintiff contends that allowing Williams to come back to work and the continued

---

[13]Delphi calls the court's attention to decisions from several other circuits, however this court determines that *Adler* sums up the test most accurately. *See, e.g. Fenton v. HiSAN, Inc.,* 174 F.3d 827, 831 (6th Cir. 1999) (employer was not liable on plaintiff's claim of sexual harassment by her coworker where she quit immediately after complaining but employer's actions showed intent to address her complaints and ameliorate the situation); *Fleenor v. Hewitt Soap Co.,* 81 F.3d 48, 51 (6th Cir. 1996) (affirming dismissal of claim of co-worker harassment where the company's action in reprimanding harasser was sufficient to stop it and relieve the company of liability), *cert. denied,* 519 U.S. 863 (1995).

evidence of misconduct at Delphi preclude a finding that its response was "prompt and effective." Given the circumstances, she argues that termination was the only appropriate response. *Alder,* by contrast, indicates that "an employer is not required to terminate a perpetrator except where termination is the only response that would be reasonably calculated to end the harassment." *Id.* at 676. The court further noted that, "[W]hile there may be egregious cases where such action is the only option for the employer, in less serious cases a reprimand, brief suspension or other remedial steps may be sufficient to remedy the situation." *Id.* (quoting *Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 579 n.6 (10th Cir. 1990)); *see also Portera v. Winn Dixie*, 996 F. Supp. 1418, 1428 (M.D. Ala. 1998) (allowing the employer wide latitude in fashioning an appropriate response). This court is satisfied that the aforementioned egregious circumstances were not present and that Delphi acted promptly and effectively to stop the harassment. Williams was suspended, allowed to return to work on a "one last chance basis" and there have been no further complaints about him. Accordingly, there is no genuine issue of material fact where the defendant has acted promptly and the harassment has in fact stopped.

In conclusion, Delphi is entitled to summary judgment on Ms. Cornwell's claims of hostile work place discrimination because there is no evidence from which a jury could reasonably conclude the hostile environment at Delphi was due to gender discrimination and there is no issue of material fact regarding the dispatch or the efficacy of Delphi's response to Williams's actions.

### C. Ms. Cornwell's Claim for a Constructive Discharge

Delphi alleges that Cornwell did not state a claim for constructive discharge in her complaint. Although this court is inclined to agree, for purposes of summary judgment it will consider her allegations since plaintiff's statement of facts and refusal to return to work were sufficient to place the defendant on notice of such a claim. *See Swerkiewicz v. Sorema, N.A.,* 534 U.S. 506, ___; 122 S.Ct. 992, 997 (2002) (indicating that the precise requirements of a prima facie case can vary by pleading or context).[14]

To establish a prima facie case of a constructive discharge in violation of Title VII, the employee must prove that she felt compelled to resign and "[her] working conditions were so altered that a reasonable person in [her] position would be compelled to resign." *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d at 1317; *Kilgore v. Thompson & Brock Management, Inc.,* 93 F.3d 752 (11th Cir. 1997) (citing the standard). The parties contest whether Cornwell acted as a "reasonable person" when she decided not to return to work at Delphi after receiving notice that Williams would be returning to the plant. This court concludes that she cannot prove she did.

Delphi contends that by not returning to work, Cornwell effectively failed to provide Delphi with an opportunity to correct the situation. They direct the court's attention to *Kilgore v. Thompson & Brock Management, Inc.,* 93 F.3d 752 (11th Cir. 1997). In that case, the complainants also charged the company with harassment and then chose not to return

---

[14]Defendants also call the court's attention to *Benoit v. Owen* where the court dismissed plaintiff's claims as it was "impossible to determine from the pleading what adverse employment action plaintiffs are alleging." 960 F. Supp. 287, 291 (S.D. Fla. 1997), *aff'd*, 162 F.2d 1177 (11th Cir. 1998). In this case, the complaint does not reach the level of "impossible" and accordingly the court will look at the allegations in a context most favorable to Cornwell.

to work. *Kilgore*, 93 F.3d at 752. The court held that "[a] constructive discharge generally will not be found if the employer is not given sufficient time to remedy the situation." *Id; see also Montero v. AGCO Corp.*, 192 F.3d 856, 861 (9th Cir. 1999) (holding that a plaintiff was not constructively discharged when she refused to return to work despite employer's terminating one alleged harasser and disciplining two others because a reasonable person would not have felt forced to quit). Cornwell argues that her resignation was justified in order to escape "intolerable and illegal employment requirements." *Henson*, 682 F.2d at 908 (quoting *Young v. Southwestern Savings & Loan*, 509 F.2d 140, 144 (5th Cir. 1975)). Plaintiffs allege that Cornwell was psychologically unable to bear the thought of returning to work with Williams.

This court is satisfied that *Kilgore* is applicable to the present case. Delphi met its initial burden when it took an employment action against Williams. Had Cornwell returned to work and suffered harassment or other discrimination, the result might be closer, but that is not what happened and, absent egregious circumstances, the court will not hold that Cornwell was constructively discharged where she did not allow Delphi a reasonable opportunity to address her concerns.

### D. Ms. Cornwell's Invasion of Privacy Claim

#### 1. Williams's Liability

Ms. Cornwell does not dispute Delphi's characterization of her invasion of privacy claim as a "wrongful intrusion" upon the plaintiff's physical solitude or seclusion case. *See Johnson v. Wal-Mart Stores, Inc.*, 987 F. Supp. 1376, 1396-97 (M.D. Ala. 1997) (listing Alabama invasion of privacy claims). To succeed on a claim alleging invasion of privacy

22

based upon sexual harassment, an Alabama plaintiff must show: (1) the matters intruded into are of a private nature; and (2) the intrusion would be so offensive or objectionable that a reasonable person of ordinary sensibilities subjected to it would experience outrage, mental suffering, shame or humiliation. *Busby v. Truswal Sys. Corp.,* 551 So. 2d 322, 323 (Ala. 1989); *Logan v. Sears Roebuck & Co.,* 466 So. 2d 121, 124 (Ala. 1985); *Phillips v. Smalley Maintenance Servs. Inc.,* 435 So. 2d 705, 708 (Ala. 1983).

When considering invasion of privacy claims, the court determines whether the defendant has committed a "'wrongful intrusion into one's private activities in such manner so as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.' While the conduct needed to support an invasion of privacy claim need not be 'extreme and outrageous,' in cases where a viable claim for invasion of privacy exists, the defendant's behavior frequently approaches such a degree." *Durham v. Philippou,* 968 F. Supp. 648, 660-661 (M.D. Ala. 1997); *see also Brassfield v. Jack McLendon Furniture, Inc.* 953 F. Supp. 1438 (M.D. Ala. 1996) (describing the Alabama standard as a spectrum ranging from extreme and outrageous questioning about an employee's sex life behind closed doors for a period over three months combined with sexual advances). Williams contends and the court agrees that Ms. Cornwell is unable to prove the second element of her claim.

An intrusion is actionable only if it would be highly offensive to a reasonable person. *Pouncy v. Vulcan Materials Co.,* 920 F. Supp. 1566, 1584 (N.D. Ala. 1996). The reasonable person standard is a question of law and the court examines three factors: (1) whether the subject of the intrusion is information which is private or entitled to be private; (2) the means of intrusion; and (3) the purpose for which the information was obtained. *Id.* In

addition, "evidence of an invasion of privacy must be a course of conduct which rises to a level that has been previously held to constitute an invasion of privacy." *Portera v. Winn Dixie of Montgomery, Inc.,* 996 F. Supp. 1418, 1435 (M.D. Ala. 1998).

Ms. Cornwell's grounds for her invasion of privacy claim are identical to those in her Title VII claim. Once again, this court must determine whether Williams's jokes, comments about Ms. Cornwell's breasts, and other crude statements recited *supra* considered in a light most favorable to Ms. Cornwell, amount to an invasion of privacy or whether they constitute merely boorish and lewd behavior.

Ms. Cornwell primarily relies on *Ex Parte Atmore Community Hospital,* 719 So. 2d 1190 (Ala. 1998) and *Johnson v. Wal-mart Stores, Inc.,* 987 F. Supp. 1398 (M.D. Ala. 1998). Viewing the facts favorably to the plaintiff, this court cannot find that either establishes a precedent for finding an invasion of privacy in her case. In *Atmore,* the court denied summary judgment where the plaintiff's supervisor made lewd comments, asked her to meet him outside of work hours for non-business purposes, looked up her skirt, regularly touched her in a sexual manner, withheld her time card, and threw a box of labels at her. 719 So. 2d at 1191.[15] Likewise in *Johnson,* the court indicated there was a colorable claim for invasion of privacy where the plaintiff was instructed to meet her employer at a hotel where he also lived where the defendant then invited her into his hotel room, wrapped his arms around her waist, and would not allow her to leave. 987 F. Supp. at 1380, 1396-97.

---

[15] *See also. McIsaac v. WZEW-FM Corporation,* 495 So. 2d 649, 652 (Ala. 1986) (denying summary judgment where employer asked female employee to "be available," tried to kiss her, and later attempted to have her fired for resisting his advances. *Id.* at 650-51. In addition, the court noted that "[e]ven the dire affront of inviting an unwilling woman to illicit intercourse has been held by most courts to be no such outrage as to lead to liability." *Id.* quoting *Logan v. Sears Roebuck & Co.,* 466 So. 2d 121 (Ala. 1985).

Alabama has never recited an exhaustive list of dispositive factors sufficient to create an actionable claim for invasion of privacy, but the cases generally involve conduct by a supervisor or other manager and conduct beyond lewd jokes and suggestions. Although Williams's comments to Cornwell were offensive and in exceptionally poor taste, they did not rise to the level of outrageous conduct sufficient to meet Alabama's rigorous standard as set out in *Atmore* and *Johnson*. Therefore, the court concludes that a reasonable jury could not find that Williams's conduct constituted a pattern of severe and pervasive harassment which is so highly offensive to a reasonable person.

### 2. Delphi's Liability

An employer is liable for the intentional torts of an employee if: (1) the employee's acts are committed in furtherance of the business of the employer; (2) the employee's acts are within the line and scope of employment; or (3) the employer participated in, authorized or ratified the tortious act. *Atmore*, 719 So. 2d at 1193 (quoting *Potts v. BE&K Constr. Co.,* 604 So. 2d 398, 400 (Ala. 1992). The court agrees with Delphi that the only possible ground that Cornwell might have regarding its liability is ratification. An employer ratifies conduct if: (1) the employer has actual knowledge of the tortious conduct; (2) based on this knowledge the employer knew the conduct constituted a tort; (3) and the employer failed to take adequate steps to stop the tortious conduct. *Id.* (quoting *Potts* at 400-01). "Adequate" means that the employer took reasonable and necessary steps to stop the tortious conduct. Where the employer's actions stop the tortious conduct, this court has held that the corrective action is adequate as a matter of law.

Ms. Cornwell has presented evidence that the atmosphere at Delphi was not family-friendly, but she has presented no evidence that Williams's harassment continued past the remedial action taken by Delphi. As such, the court finds that there can be no ratification. The defendants are due judgment as a matter of law on the plaintiff's invasion of privacy claim.

### D. Ms. Cornwell's Negligence Claims

Both plaintiff and defendant agree that Alabama law does not recognize an independent cause of action for sexual harassment. *Machen v. Childersburg BanCorp Inc.,* 761 So. 2d 981, 983 n.1 (Ala. 1999); *Stevenson v. Precision Standard, Inc.,* 762 So. 2d 820, 827 n.6 (Ala. 1999). Plaintiff contends that Delphi is liable for both (1) its ratification of Williams' conduct and (2) its own negligence or wantoness in training, supervision, disciplining, and retaining Williams as an employee. The court agrees with Delphi's assertion that the Alabama Supreme Court has never recognized the tort of negligent supervision and negligent hiring where there is no underlying state tort law claim. *See Townsend v. Flagstar Enterprises, et. al.* (CV-99-N-1507-W) (N.D. Ala. 2000) (noting Alabama has "never recognized a negligent supervision claim premised upon a federal statutory cause of action) (citing *Stevenson v. Presicion Standard, Inc.*, 762 So. 2d 820 (Ala. 1999)); *Hathorn v. Boise Cascade Corp.*, 1998 U.S. Dist. LEXIS 18113, pp. 24-25 (S.D. Ala. 1998) (granting summary judgment for defendant employer).

Even if Cornwell could somehow establish that Delphi is liable, summary judgment would still be appropriate. As the court in *Portera v. Winn Dixie, Inc.* explained:

26

> In Alabama, to recover against an employer under the theory of negligent supervision, a plaintiff first must show 'by affirmative proof that the alleged incompetence of the employee was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence.'"

996 F. Supp. 1418, 1438 (M.D. Ala. 1998) (quoting *Ledbetter v. United Am. Ins. Co.,* 624 So. 2d 1371 (Ala. 1993). Furthermore an employer is not liable unless "he know[s] or should have known by due diligence of an employee's incompetence." *Id.* (quoting *Ledbetter*). Cornwell has provided no evidence that Delphi had any notice Williams was likely to harass her. She alleges that Delphi had notice because Williams's comments were outrageous, but also admits that no manager or supervisor ever actually witnessed the harassment. By contrast, she admits that she delayed in complaining for fear that no one would believe her and stated that Williams had a "Jekyll and Hyde" personality. Alabama law does not require clairvoyance on the part of the defendant so that it may anticipate and intercept all instances of sexual harassment. Accordingly, Ms. Cornwell's state law claims against Williams and Delphi will be dismissed in their entirety.

## V.    Conclusion

The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this ___7th___ of October, 2002.

_____
EDWIN NELSON
UNITED STATES DISTRICT JUDGE